UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RONALD MILES,

                    Plaintiff,                    05-CV-6398T

v.                                                **DECISION
                                                  and ORDER**

JO ANNE BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____

<u>INTRODUCTION</u>

        Plaintiff, Ronald Miles ("plaintiff" or "Miles"), filed this action pursuant to the Social Security Act, §§ 216(I) and 223(a), seeking review of a final decision by the Commissioner of Social Security ("Commissioner"), denying his application for Disability Insurance Benefits("DIB"). On January 5, 2005, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the plaintiff moved for judgment on the pleadings. On February 22, 2006, the Commissioner moved for judgment on the pleadings affirming her final decision that the plaintiff is not eligible for DIB.

        For the reasons that follow, this Court finds that the Commissioner's decision is not supported by substantial evidence. Accordingly, the defendant's motion for judgment on the pleadings is denied. I further find substantial evidence exists in the record that the plaintiff is disabled and I order that this case be remanded to the Commissioner for calculation and payment of benefits.

PROCEDURAL HISTORY

The plaintiff filed this application for DIB on August 25, 2003, alleging his disability since February 28, 2003, due to low back and leg pain diagnosed as degenerative disc disease. (T. 21-33, 50)[1]. The plaintiff met the special insured status earnings requirement of the Social Security Act for purposes of establishing entitlement to disability insurance benefits on the alleged date of onset, and will continue to meet requirements through December 31, 2008. (T. 38-39). The plaintiff's application for DIB was denied and on September 29, 2004, a hearing was held before Administrative Law Judge ("ALJ") Harry Barr. (T. 403-22). On February 11, 2005, the ALJ considering the case *de novo* found that the plaintiff was not disabled because his impairments although severe did not meet one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. and that the plaintiff was able to perform a full range of light work. (T. 9-19). On June 30, 2005, the ALJ'S decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. Id. Thereafter, plaintiff filed this civil appeal.

---

[1]     All citations "T" refer to the Transcript of the Administrative Record submitted to the Court as part of defendant's Answer, which include, *inter alia*, plaintiff's medical records, a transcript of the hearing before the ALJ and copies of the ALJ's decision denying plaintiff DIB.

BACKGROUND

A. Non-Medical Evidence

The plaintiff is a 51 year old man with a high school education and one year of college. (T. 31, 56). In 1975, the plaintiff was hired by Dresser Rand to work as a machine operator. (T. 67). His job required him to spend most of the day on his feet manually lifting objects which weighed 50 pounds or more on a daily basis. (T. 68). The plaintiff held this job for 26 years but in August of 2001, he switched to the lighter and lower paying job of utility worker (at Dresser Rand) lifting 20 pounds a day because he was no longer physically able to perform his job requirements as a machine operator. (T. 62, 67). By February 28, 2003, the plaintiff was totally unable to work due to low back and leg pain and a right shoulder injury. (T. 50, 407).

The plaintiff stated that he was most comfortable sitting in his recliner using a heat pad on and off. (T. 415-416). He reported that he did some laundry, took out garbage, burned papers, drove a car, prepared meals, walked for twenty minutes each day and helped his son with yard work (although his son did ninety percent of the yard work). (T. 80). He stated that he also spends time attending physical therapy and water therapy, going to doctor's appointments, the library, and high school football games. (T. 411).

B. Medical Evidence

In 1993, due to back problems, the plaintiff underwent a lumbar laminectomy. (T. 206, 412).

On November 4, 2000, the plaintiff's treating physician, Dr. Jana Pulkrabek ("Dr. Pulkrabek") examined him for low back pain which radiated to both knees. He was taking Celebrex for the condition. (T. 263).

On December 7, 2000 an MRI of the plaintiff's lumbar spine found herniated discs at L4-5 and L-5-S1. (T. 262). Eleven days later, the plaintiff began a course of physical therapy three times a week. (T. 182-191).

In February 2001, the plaintiff went for a neurological consult, but was advised against having back surgery. (T. 185).

On July 2, 2001, a stress test found that the plaintiff had inferolateral wall ischemia and episodes of ventricular tachycardia. (T. 92). The report also noted that the plaintiff suffered from diabetes for five years and used a C-PAP machine at night due to sleep apnea. Id. A cardiac catheterization was carried out which found a 50% blockage in the left anterior descending artery and milder problems in other arteries. (T. 96).

On July 11, 2001, Dr. Pulkrabek wrote that because the plaintiff continued to experience substantial back pain that he could not continue to work as machine operator. (T. 251). At his

4

doctor's recommendation, the plaintiff switched to a lighter job of utility worker at Dresser Rand. (T. 62, 67).

On September 18, 2001, the plaintiff told his physical therapist that his work change did not alleviate his back pain but he still wanted to continue to work. (T. 165).

On November 15, 2001, Dr. Pulkrabek noted that the plaintiff was having a lot of pain despite the exercise and physical therapy that he was performing. (T. 255-256).

On January 15, 2002, Dr. Pulkrabek wrote that the plaintiff's back condition was deteriorating and that he might have to change his field of work. (T. 250).

In February 2002, Dr. Pulkrabek wrote that the plaintiff was having trouble sleeping due to his back pain. (T. 246).

On March 6, 2002, Dr. Pulkrabek described the plaintiff as "an amazing person with so much lower back pain and [yet] he continues working." (T. 247).

On December 13, 2002, the plaintiff underwent a lumbar MRI which found disc bulging and scar formation at L4-5 and L5-S1. (T. 239). The plaintiff complained of experiencing total left leg numbness at work but still continued his job. (T. 238).

On February 27, 2003, the plaintiff complained to Dr. Pulkrabek that his pain was "terrible." (T. 232). She observed that he was in pain and recommended that he stop working and resume exercising at the YMCA which had been helpful in the past. Id.

On February 28, 2003 the plaintiff's right shoulder was severely injured at work when his coat was caught in a hopper, jerking him up in the air. (T. 233). An MRI procedure six weeks later disclosed right shoulder impingement and a partial rotator cuff tear. (T. 103-104).

In July 2003, the plaintiff underwent right shoulder surgery which he maintained was successful. (T. 413).

On April 3, 2003, Dr. Seth Zeidman ("Dr. Zeidman"), a neurosurgeon examined the plaintiff. (T. 211) Dr. Zeidman ordered a CY myelogram which revealed a very large osteophyte at L4-L5 which was "traumatically" compressing the nerve root. Id. He also found the presence of bone spurs at L5-S1 and facet arthropathy at L3-4 both of which he felt caused the back and leg pain. Id. The doctor recommended a decompressive laminectomy from L3-S1 with a fusion from L4 through S1. Id. The doctor opined that the plaintiff was "temporarily totally disabled with respect to his occupation at the present time." Id.

On April 28, 2003, Dr. Pulkrabek noted that the plaintiff was in "tremendous" pain in the back and arm and that he was having trouble sleeping. (T. 226).

On October 5, 2003 the Social Security Administration ("SSA") referred the plaintiff to Dr. Frank Norksy ("Dr. Norsky") for an evaluation.  (T. 198-200). Dr. Norksy observed severe limitation in the plaintiff's lumbar motion range of motion, no lateral lumbar

range of motion, he walked with a limp, his forward flexion was 10 degrees, he could not walk on his heels or toes and he could not engage in kneeling or squatting. (T. 198-200). He noted that the plaintiff could not do any physical activity which involved standing, walking, bending, or lifting and that his prognosis would depend on the results of the plaintiff's back surgery. Id.

On October 14, 2003, Dr. Zeidman performed decompressive laminectomies at L2, L3, L4, L5, and S1, and a fusion at L4-S1. (T. 204).

On December 5, 2003, the plaintiff began a lengthy course of physical therapy. (T. 305). He maintains that he was still experiencing aching in the low back and left leg. Id.

On December 11, 2003, Dr. Zeidman observed that the plaintiff was progressing well but that he was still "temporarily totally disabled." (370-374).

On February 12, 2004, Dr. Zeidman wrote that the plaintiff was "progressing wonderfully" but was still "temporarily totally disabled" (T. 371).

By March 2004, the plaintiff was pain free 75% of the time and even doing some bending. (T. 350).

In June of 2004, the plaintiff had a relapse caused by swimming. (T. 342).

In June 2004, the plaintiff saw Dr. Michael Morrongiello, ("Dr. Morrongiello"), a psychologist due to his frustrations of not

being able to return to work. (T. 282). The plaintiff told this doctor that he had contemplated suicide because of his feelings of hopelessness but that he did not go through with it because of his wife. Id. Dr. Morrongiello diagnosed the plaintiff as suffering from dysthmia. (T. 281).

The plaintiff's workers' compensation carrier referred him to Dr. David Storrs, ("Dr. Storrs"), a neurosurgeon for an examination. (T. 286). On July 20, 2004, Dr. Storrs examined the plaintiff and noted that the plaintiff was wearing a bone stimulator every two hours, having physical therapy three times a week, and taking Darvocet to cope with his pain. (T. 288-290). The doctor noted typical pain responses of a "post-op back." He furthered noted that plaintiff's lateral lumbar bending and lumbar extension were only about 10 degrees and caused back pain.  He sat and stood slowly, his back muscles were tight, and he had trouble toe and heel walking due to back pain. Id. Dr. Storrs opined that the plaintiff would be capable of work with a 15 pound lifting limit, with no bending or prolonged stooping. He also wrote that if spine films prove stability of the spine, the plaintiff would still have "a moderate to marked disability based on his rather significant back pain and a restricted range of motion, inability to stand or sit for any prolonged period of time." Id. Furthermore, Dr. Storrs concluded that the plaintiff would have to start out

with part-time "light sedentary" work before he could return to full time work and that he could not return to his past job. Id.

On July 22, 2004, Dr. Zeidman again noted that the plaintiff was progressing fairly well, but that he was anxious to return to work. (T. 374). Dr. Zeidman opined that plaintiff would continue to have restrictions for at least two years postoperatively with respect to lifting, pushing, excessive standing, sitting, and bending. (T. 374). He reiterated that the plaintiff was temporarily totally disabled. Id.

On January 22, 2004, Dr. Pulkrabek saw the plaintiff and it was her opinion that the October 2003 surgery had a good result because the plaintiff's *constant* pain and numbness had lessened. (T. 382). However, on September 1, 2004, she noted that the plaintiff "has been struggling because he is still having a lot of pain" and was "really not able to return to work." (T. 376).

In September 2004, the plaintiff told Dr. Zeidman that he was experiencing low back pain, muscle spasms and tension. (T. 375). The doctor noted that the plaintiff has been "progessing slowly" and that he was still temporarily totally disabled. Id. The doctor requested a stimulator to ease the muscle spasms and back pain. Id.

In September 2004, the plaintiff testified at his hearing that he tried to utilize the services of New York's Vocational and Educational Services for Individual's with Disabilities ("VESID"), the state retraining agency, to assist him in finding a new

9

occupation. (T. 415). The agency suggested that the plaintiff work as an escort driver for a few days a week, a few hours a day. Id. However, the plaintiff testified that Dr. Pulkrabek was opposed to it, as she feared that the plaintiff would only re-injure his back. Id. Furthermore, the plaintiff testified that Dr. Zeidman's staff, after consultation with Dr. Pulkrabek, agreed with her assessment. (T. 421).

On October 6, 2004, Dr. Pulkrabek completed a work assessment form with the following restrictions, the plaintiff 1) could not engage in lifting or carrying; 2) could only stand or sit up to two hours in one workday and walk up to one hour; 3) could only use left foot controls; and 4) could not push, pull, climb, balance, stoop or crawl. (T. 390-393).

LEGAL STANDARD

A. Jurisdiction and Scope of Review-

42 U.S.C. § 405(g), grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. When considering a claim, the Court must accept the findings of fact made by the Commissioner provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938).

10

Under this standard, the court's sole inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the law judge." Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).

    B. Legal Standards-

Under the Social Security Act ("the Act"), disability insurance benefits may not be paid unless a claimant meets the insured status requirements of 42 U.S.C. § 423(c). In addition to establishing insured status, plaintiff must also demonstrate :

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less then 12 months...

42 U.S.C. 423(d)(1)(A); see Barnhart v. Walton, 535 U.S. 212, 214 (2002).

Furthermore, the Act requires that an individual will be determined under a disability only if his physical or mental impairments are so severe that he is unable to do neither his previous work, nor when considering his age, education and previous work experience, any other work in the national economy. 42 U.S.C. § 423(d)(2)(A); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

In evaluating disability claims, the Commissioner instructs adjudicators to follow the five step process promulgated in 20 C.F.R. § 416.920. First, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.

11

Second, if the claimant is not so engaged, the Commissioner must determine whether the claimant has a "severe impairment" which significantly limits his ability to work.  Third, if the claimant does suffer such an impairment, the Commissioner must determine whether it corresponds with one of the conditions presumed to be a disability by the Social Security Commission.  If it does, then no further inquiry is made as to age, education or experience and the claimant is presumed to be disabled.  If the impairment is not the equivalent of a condition on the list, the fourth inquiry is whether the claimant is nevertheless able to perform his past work. If he is not, the fifth and final inquiry is whether the claimant can perform any other work.  The burden of proving the first four elements is on the claimant, while the burden of proving the fifth element is on the Commissioner.  <u>Bush v. Shalala</u>, 94 F.3d 40, 45 (2d Cir. 1996).

<u>DISCUSSION</u>

The Commissioner contends that there is substantial evidence in the record to support the ALJ's determination that the plaintiff is not disabled and is capable of light work, thus, her motion for judgment on the pleadings should be granted.

The plaintiff contends that although the ALJ followed the five step procedure, he improperly concluded that the plaintiff was not disabled because the claimed disability did not constitute a severe impairment within the meaning of the Act. (T. 9-19) Specifically,

12

the plaintiff argues that the ALJ erred when he 1) disregarded the opinions of not only the treating physicians but also of Dr. Storrs, the workers' compensation physician; 2) arbitrarily substituted his own judgment for competent medical opinions; and 3) failed to give the plaintiff substantial credibility. Thus, the plaintiff argues that because the ALJ erred, and he is in fact disabled, his claim should be remanded to the Commissioner for the calculation and payment of benefits.

This Court agrees with the plaintiff for several reasons and holds that the ALJ's findings were not based on substantial evidence in the record.

First, the ALJ erred when he failed to give proper weight to the plaintiff's treating physicians opinions. The treating physician rule provides that the opinion of the treating physician is controlling where it is well supported by clinical findings and not contradicted by other substantial evidence. 20 C.F.R. §404.1527(d)(2). Here, both treating physicians Dr. Pulkrabek and Dr. Zeidman *repeatedly* stated that the plaintiff was "temporarily disabled" or "restricted" from work. (T. 209-212, 369-375, 376, 390). In a work assessment form completed in October 2004, a year after the plaintiff's back surgery, Dr. Pulkrabek continued to report that the plaintiff was unable to lift any amount of weight for any period of time. (T. 390-93). These treating physicians' opinions are not contradicted by other substantial evidence but

13

were supported by various clinical findings detailed in the record including the plaintiff's extensive 2003 reconstructive back surgery, which required decompressive surgery at five levels and a fusion at three levels. (T. 204). Furthermore, "the law gives special evidentiary weight to the opinion of the treating physician." Clark v. Commissioner, 143 F.3d 115, 118 (2d Cir. 1998). Dr. Pulkrabek and Dr. Zeidman are plaintiff's medical providers who have seen the plaintiff on a frequent basis over a long period of time. Dr. Zeidman not only performed the plaintiff's most recent back surgery but also saw the plaintiff ten times between April 2003 and September 2004. (T. 204-213, 369-375). Dr. Pulkrabek has been the plaintiff's treating internist since at least the year 2000 and saw the plaintiff over 20 times between 2002 and the end of 2004. (T. 214-263, 376-393). Moreover, it is well settled that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Balsamo v. Charter, 142 F. 3d 75, 80 (1998). Thus, the ALJ erred when he failed to special evidentiary weight to the plaintiff's treating physicians.

Additionally, the ALJ erred when he considered the plaintiff to be "generally, but not entirely, credible." (T. 15). A proper consideration of credibility must take into account a good work record which the Second Circuit has held entitles a claimant to "substantial credibility." Montes-Ruiz v. Chater, 1997 U.S. App. LEXIS 32217, at * 8 (2d Cir. 1997), citing Rivera v. Schweiker, 717

14

F.2d at 719, 725 (2d Cir. 1983). Here, the plaintiff had an outstanding work record, with 92 out of 94 covered quarters from 1973 to 2003 when he became disabled. Additionally, the plaintiff has proven to this Court his willingness and desire to work. He switched to a lower paying position at Dresser Rand in an attempt to continue working but because of his pain and physical limitations, this was unsuccessful. Furthermore, he attempted to work with VESID to find a new occupation as an escort driver but was advised against this occupation by Dr. Pulkrabek and Dr. Zeidman who both feared that he would re-injure himself. Moreover, the plaintiff on several occasions expressed his longing to return to work to his doctors, his physical therapist, and testified to this fact at the hearing. In addition, at his treating doctor's recommendation, he saw a psychologist to deal with his frustrations and depression. Plaintiff was seen by Dr. Michael Morrongillo, a psychologist, in June 2004 for his depression stemming from his inability to return to work. (T. 284) In the course of his treatment, he shared with the psychologist his ideation of hopelessness and contemplated suicide which he did not fulfill because of concerns for his wife. Dr. Morrongillo diagnosed the plaintiff as suffering from dysthmia. (T. 281) "Dysthmia is defined as a chronic, non-psychotic mood disorder characterized by depression or loss of interest or loss of pleasure in one's normal activities." Dorland's Medical Dictionary, 25th Edition.

Additionally, the substantial evidence in the record does not support the ALJ's conclusions that he found plaintiff to be "generally, but not entirely credible." (T. 15)  In support of his finding, ALJ emphasized, "during a doctor's appointment in March 2004, the claimant reported he was going to Florida and would be back in April, a plan that is inconsistent with his allegation that he is unable to stand, sit, or walk for any prolonged period."  The reasonable inferences drawn from that observation is that the ALJ concluded that if the plaintiff was physically capable of going to Florida, then he certainly is physically capable of working.  The fact that the claimant would chose to go to Florida for approximately a month in the winter does not disqualify the plaintiff or make him less credible on the question of his disability.  In this instance, it proved to be prejudicial to the plaintiff.

Moreover, unwarranted weight was given to the opinion of the physical, residual, functional capacity assessment made by "E. Holloway" dated January 27, 2004 which was inconsistent with the opinions of his treating physicians.  Mr. Holloway is a State agency reviewer who is not a medical doctor and renders his opinion based solely upon a review of the plaintiff's medical records. Based upon that review, he concludes that Mr. Miles is capable of certain levels of activity and of performing various jobs available in the national economy.  Holloway never saw the plaintiff, never

evaluated him on a personal basis, and formed his opinion solely upon an examination of plaintiff's medical records.  It is error to give that opinion the same weight as a treating physician's opinion.  For these many reasons, this Court finds that the plaintiff is credible.

It is also worthy to note that on July 2, 2001, the plaintiff underwent a stress test which disclosed that he had inferolateral wall ischemia and episodes of ventricular tachycardia.  (T. 92) That report also noted that the plaintiff suffered from diabetes for five years and used a C-PAP machine at night due to sleep apnea.  Thus, considering the combination of plaintiff's medical infirmities, substantial evidence exists in the record in favor of finding the plaintiff disabled.

Therefore, I find that the ALJ's conclusion is not supported by substantial evidence in the record but that the record, read as a whole, presents substantial evidence to support the plaintiff's claim of disability. That conclusion is supported by the opinions and conclusions of his qualified, board certified, treating physicians.

CONCLUSION

For the reasons set forth above, I do not find substantial evidence in the record to support the ALJ's conclusion that the plaintiff is not eligible for DIB.  Accordingly, the Commissioner's motion for judgment on the pleadings is denied. I further find

substantial evidence exists in the record that plaintiff is disabled and I order that this case be remanded to the Commissioner for calculation and payment of benefits.

ALL OF THE ABOVE IS SO ORDERED.


S/Michael A. Telesca
_____
    MICHAEL A. TELESCA
United States District Judge

DATED:    Rochester, New York
          May 19, 2006

18